UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LAKESIDE SURFACES, INC.,

     Plaintiff,

                                    Case No. 1:18-cv-110

v.

                                    HON. JANET T. NEFF

CAMBRIA COMPANY, LLC,

     Defendant.

_____/


# OPINION

     This is a diversity action asserting claims for breach of contract, violation of the Michigan Franchise Investment Law (MFIL), Mich. Comp. Laws § 445.1501 *et seq.*, violation of the Uniform Commercial Code (UCC), and promissory estoppel. Before the Court are Defendant's motion to dismiss the first amended complaint for failure to state a claim (ECF No. 42) and Plaintiff's motion to amend the complaint (ECF No. 52). For the reasons herein, the Court will grant Defendant's motion and dismiss the case. In addition, the Court will deny Plaintiff's motion. Suffice it to say that the path to the ultimate resolution of the issues presented is like pulling a thread and watching the whole sweater unravel. One legal analysis leads to another and another and another. The end result, however, is that this case belongs in the Minnesota forum agreed upon by the parties.

## I.    Background

     Plaintiff Lakeside Surfaces, Inc. is a Michigan corporation that fabricates and sells countertops made of quartz, stone, and other solid-surface materials. Defendant Cambria

Company, LLC is a Minnesota company that manufactures and sells its own brand of quartz countertop surfaces.

In 2011, Lakeside was a successful seller of countertops made by Cambria and other manufacturers. In recognition of that success, Cambria offered Lakeside the rare opportunity to become one of its "Lexus Partners." To qualify for this partnership, Lakeside had to meet certain requirements. Among other things, Lakeside had to have a broad customer base, a sales history averaging two truckloads of Cambria product per month, and the ability to fabricate at least 10,000 square feet of Cambria product per month. In addition, Lakeside agreed to offer Cambria's countertops as its "lead quartz surfacing product" (i.e., at least 80% of Lakeside's business). (ECF No. 4-1, PageID.68.) Lakeside also agreed to employ at least two full-time sales representatives to promote Cambria, to have its personnel attend Cambria's training program in Minnesota, to employ a field service technician trained by Cambria, to promote only Cambria's brand on all of Lakeside's vehicles, and to purchase more than $50,000 in "Cambria point of sale materials" per year. (*Id.*, PageID.67.)

The parties set forth the terms of their new relationship in a handful of documents with the following titles: Credit Agreement, Security Agreement, Order Terms and Conditions, Limited Lifetime Warranty, and Business Operating Requirements Manual (BORM) Acknowledgement Form. (*See* ECF No. 4-1.)[1] They refer to these documents as the Business Partnership Agreements ("BPA").

By all appearances, the new relationship was a profitable one. In 2017, Lakeside sold approximately $23,000,000 in Cambria products. Moreover, Lakeside alleges that it far exceeded

---

[1] The Court can consider these documents because they are mentioned in the complaint and are central to Lakeside's claims.

all of the requirements in the BPA. For instance, in 2015, 86% of Lakeside's sales came from Cambria products. By 2017, that percentage had increased to 98%. During that time period, Lakeside made significant investments to boost its sales of Cambria products. It constructed a $1,000,000 design gallery incorporating Cambria's branding, as well as a $6,000,000 facility capable of fabricating at least 50,000 square feet of Cambria slabs per month.

Cambria allegedly "pushed" its Lexus Partners to increase capacity and to sell only Cambria products. (First Am. Compl. ¶ 25, ECF No. 34.) Lakeside alleges that it never agreed to sell Cambria products exclusively; nevertheless, it was committed to their business relationship. It allegedly built its new fabrication facility with the expectation that Cambria would make Lakeside the "sole source provider" of Cambria products in Michigan. (*Id.*)

Lakeside's expectation never came to fruition and its relationship with Cambria came to an abrupt end in January 2018. A few months earlier, Lakeside employees had traveled to Cambria's headquarters in Minnesota to discuss Lakeside's desire to become the only fabricator of Cambria countertops in Michigan. Lakeside also told Cambria that it believed it could expand its market by offering builders lower cost alternatives to Cambria quartz. Cambria had some concerns about Lakeside's proposal, but it allegedly gave Lakeside verbal approval to offer a granite countertop to builders.

In December 2017, Cambria learned that Lakeside was offering its customers a new quartz product called Aurea Stone. Cambria was not pleased. On January 3, 2018, it told Lakeside that "supplying other quartz is an immediate termination of our partnership as well understood[.]" (*Id.* ¶ 33.) Cambria immediately stopped shipment on all orders from Lakeside. About a week later, Cambria formally terminated its relationship with Lakeside, claiming that Lakeside had breached their agreements.

Lakeside contends that Cambria's unilateral termination of the BPA caused significant harm to Lakeside's reputation and its ability to fulfill customer purchase orders. Cambria cancelled orders for 120 slabs of quartz, leaving Lakeside with $500,000 worth of unfulfilled customer orders.

Count I of the first amended complaint claims that Cambria breached the BPA, and the implied covenant of good faith and fair dealing therein, by terminating the BPA without good cause and without reasonable notice and an opportunity to cure. Lakeside contends that Michigan's Franchise Investment Law (MFIL), Mich. Comp. Laws § 445.1501 et seq., required good cause as a basis for terminating their relationship.

Count II claims that Cambria did not comply with the MFIL in connection with the offer, sale, or purchase of a franchise. Specifically, Cambria allegedly committed fraud under Mich. Comp. Laws § 445.1505(c) by "deceitfully encourag[ing]" Lakeside to build the fabrication facility and to make other capital investments so that Lakeside could become the exclusive provider of Cambria products in Michigan when, in fact, Cambria never intended to make Lakeside an exclusive distributor. (First Am. Compl. ¶ 66.) In addition, Cambria allegedly failed to disclose the information required by Mich. Comp. Laws § 445.1508 for the sale of a franchise.

Count II also repeats the claim in Count I that Cambria did not have good cause to terminate the BPA, and did not provide Lakeside notice of a purported breach and an opportunity to cure that breach, but frames Cambria's conduct as a violation of the MFIL, Mich. Comp. Laws § 445.1527(c).

Count III claims that Cambria did not act in good faith and did not provide reasonable notice of termination as required by Section 309 of the Uniform Commercial Code.

Count IV asserts a claim for promissory estoppel.  Lakeside contends that it reasonably relied upon Cambria's representations that their business relationship would continue and that Cambria would make Lakeside a "sole source supplier" of Cambria products in Michigan.  (First Am. Compl. ¶ 88.)

Count V claims that Lakeside is entitled to declaratory relief under 28 U.S.C. § 2201. Specifically, Lakeside seeks a declaration that Cambria wrongfully terminated their agreements and that Lakeside is the rightful owner of all "floor plan displays and related advertisement goods and materials it purchased[.]"  (*Id.* ¶ 99.)

As relief, Lakeside seeks monetary damages for the harm caused by Cambria, as well as the declaration in Count V.

## II.     Dismissal Standard

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When considering a motion to dismiss for failure to state a claim, the Court generally does not consider matters outside the pleadings unless the Court treats the motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). On the other hand, the Court may consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt*, 835 F.3d at 640.

## III.    Forum-Selection Clause

Cambria argues that the Court should dismiss this action because Lakeside's claims belong in a different forum. The BPA contains a provision designating a Minnesota state court as the proper forum for this dispute. A Rule 12(b)(6) motion is a permissible way to enforce a forum-selection clause. *See Wilson v. 5 Choices, LLC*, 776 F. App'x 320, 326 (6th Cir. 2019).

The Credit Agreement states:

> This agreement shall be governed by and construed in accordance with the laws of the State of Minnesota. Any proceeding involving this Agreement and/or any claims or disputes relating to the agreements and transactions between the parties shall be in the District Court of Le Sueur County, State of Minnesota, and the undersigned hereby submits to the jurisdiction and venue of that Court. The undersigned agrees not to raise and waives any objection or defense based upon the

> venue of such Court and any objection or defense based on forum non conveniens. The Customer also agrees to the terms and conditions of the other agreements included herein, Cambria Order Terms and Conditions, the Cambria Natural Quartz Lifetime Limited Warranty, and the Security Agreement (if any) which are hereby made a part of this Agreement.

(ECF No. 4-1, PageID.56.)  In other words, the Credit Agreement incorporates the terms of the other documents in the BPA and specifies that the proper forum for resolving any claims or disputes relating to those agreements and any transactions between the parties is the District Court of Le Sueur County, Minnesota.  This clause is broad enough to encompass all of Lakeside's claims because they all "relate to" the agreements and transactions between the parties.  Moreover, the clause states that any proceedings "shall" be in Minnesota, which means that the clause is mandatory, rather than permissive.  This Court is not the District Court of Le Sueur County, Minnesota.  Consequently, the Court must determine whether the forum-selection clause is enforceable, and if so, whether the Court should enforce it.

Lakeside responds that the forum-selection clause is invalid under Michigan law.  There are two problems with this argument.  The first is that federal law, not state law, governs the enforceability of a forum-selection clause in these proceedings.  The second is that the parties agreed that Minnesota law, not Michigan law, would govern their agreement.  Thus, to the extent that the Court must look to state law, the forum-selection clause is valid and enforceable.

### A.    The forum-selection clause is enforceable under federal law

In a diversity action like this one, "the enforceability of the forum selection clause is governed by federal law."  *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009).  According to the Sixth Circuit, enforcement of a forum-selection clause falls on the procedural side of the line drawn in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938), between procedural

issues to which the Court applies federal law and substantive issues to which the Court applies the law of the forum state.

Under federal law, a court must consider the following factors to determine whether a forum-selection clause is enforceable: "(1) whether the clause was obtained by fraud, duress, or other unconscionable means; (2) whether the designated forum would ineffectively or unfairly handle the suit; and (3) whether the designated forum would be so seriously inconvenient such that requiring the plaintiff to bring suit there would be unjust." *Wong*, 589 F.3d at 828. The burden of showing that the forum-selection clause is unenforceable lies with the party opposing enforcement thereof. *Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 929 (6th Cir. 2014).

Lakeside does not address any of the foregoing factors in its briefs. It does not contend that the forum-selection clause was obtained by fraud, duress, or other unconscionable means. It does not contend that a Minnesota state court would ineffectively or unfairly handle its suit. And it does not contend that such a forum would be seriously inconvenient. On the contrary, Lakeside alleges in the complaint that it regularly sends its employees to Minnesota for training. It also sent representatives to Minnesota to discuss its plan to be the exclusive provider of Cambria products in Michigan. That being the case, Lakeside has not shown that it would be unjust for it to pursue its claims in Minnesota. Accordingly, Lakeside has not shown that the forum-selection clause is unenforceable under the test in *Wong*.

### B. To the extent that state law is relevant, the Court can enforce the forum-selection clause

As indicated, Lakeside contends that the forum-selection clause is invalid under the MFIL, which renders void and unenforceable any provision in a franchise agreement "requiring that arbitration or litigation be conducted outside [Michigan]." Mich. Comp. Laws § 445.1527(f). Although *Wong* does not permit the Court to consider the impact of state law on the enforceability

of a forum-selection clause, some courts have reasoned that the *validity* of a forum-selection clause is distinct from its *enforceability*. *See Arbor Beverage Co. v. Phillips Farms, LLC*, No. 14-CV-12907, 2015 WL 470603, at *5 (E.D. Mich. Feb. 4, 2015). ("[T]he *Wong* inquiry evaluates the enforceability of the forum selection clause, not the validity of it."); *Morton v. E. Kenneth Wall & Assocs., Inc.*, No. 12-2882-STA-dkv, 2013 WL 12149641, at *2 (W.D. Tenn. Jan. 30, 2013) ("The holding of *Wong v. Party Gaming* does not explicitly apply to situations where state law purports to make a forum selection clause void *ab initio* versus making them simply unenforceable."). After all, contracts are creatures of state law. If Michigan law rendered the forum selection clause void at the time the parties agreed to it, then arguably there is nothing for this Court to enforce. Consequently, perhaps the Court can examine the clause's validity under state law before determining whether it is enforceable under the factors in *Wong*. *Cf. Langley v. Prudential Mortg. Capital Co., LLC*, 546 F.3d 365, 368 (6th Cir. 2008) (affirming district court's decision to look at state law to determine "the initial question of whether the agreements containing the forum selection clauses were valid") (decided before *Wong*).

Examination of the factors in *Wong* reveals that the distinction between validity and enforceability is not clear cut. Those factors already take into account circumstances like unconscionability and fraud, which render a contract, or portion thereof, invalid under the laws of many states, including Michigan. The court in *Wong* could have included additional factors bearing on the validity of a forum selection clause, such as whether the forum selection clause conflicts with the law of a state with an interest in the dispute, but it did not do so.

The reasons given by the court in *Wong* for adopting federal law are also instructive. It adopted factors from the Restatement (Second) of Conflict of Laws[2] in order to "maintain harmony" with other Circuits, avoid "inconsistent decisions in diversity cases," and promote the "strong federal interest in procedural matters in federal court[.]" *Wong*, 589 F.3d at 827-28. Permitting Lakeside to assert a state-specific defense to enforcement of the forum-selection clause in this case arguably undermines the reasons given by the Court of Appeals for adopting a uniform federal standard.

Furthermore, Lakeside's reliance on state law to avoid enforcement of the forum selection clause is similar to an approach expressly rejected by the Sixth Circuit. The Court of Appeals declined to follow the Seventh and Tenth Circuits, which "have held that the law which governs the contract as a whole also governs the enforceability of the forum selection clause." *Wong*, 589 F.3d at 827. *Wong* rejected that approach in favor of its three-factor test. This Court must do the same.

Even if state law is not directly applicable, the Supreme Court suggested another avenue for potentially considering the impact of state law in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972). In *Bremen*, the Supreme Court stated that a forum-selection clause "should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Id.* at 15. Here, that would mean the Court should not enforce the parties' forum-selection clause if doing so would be contrary to the strong public policy of Michigan, the "forum" in which Lakeside brought its action.

---

[2] *Wong* cited *Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369 (6th Cir. 1999) as the source of its factors. *Security Watch* obtained the factors from the Second Restatement § 80 cmt. c. *Security Watch*, 176 F.3d at 375. Curiously, neither *Wong* nor *Security Watch* mention that the Second Restatement also states that "Effect must be denied a choice-of-forum provision in situations where the provision is invalidated by statute." Restatement (Second) of Conflict of Laws § 80 cmt. b.

After *Wong*, the role that *Bremen* plays in diversity cases is unclear. *Wong* did not list the "public policy" rule in *Bremen* as one of the factors that a court should consider. *Bremen* is distinguishable because it involved admiralty jurisdiction; however, the Sixth Circuit has cited *Bremen* in many diversity cases. *See, e.g.*, *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007); *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1229 (6th Cir. 1995); *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1136 (6th Cir. 1991).

Some district courts in this circuit have referred to the public policy rule in *Bremen* as an "exception" to the *Wong* test, or as an additional factor for the court to consider. *See, e.g.*, *City of Jeffersontown, Ky. v. Digital Ally, Inc.*, No. 3:18-CV-00170-RGJ-RSE, 2019 WL 1440315, at *2 (W.D. Ky. Mar. 31, 2019); *Aldridge Elec., Inc. v. Am. Mun. Power, Inc.*, No. 5:16–CV–00163–GNS–LLK, 2017 WL 986682, at *2 (W.D. Ky. Mar. 14, 2017); *Brand Energy Servs., LLC v. Enerfab Power & Indus., Inc.*, No. 3:15-cv-01530, 2016 WL 10650607, at *4 (M.D. Tenn. Oct. 28, 2016); *Unique Shopping Network, LLC v. United Bank Card, Inc.*, No. 3:10–CV–428, 2011 WL 2181959, at *9 (E.D. Tenn. June 3, 2011). In addition, other circuits that apply federal law to the enforcement of forum-selection clauses in diversity cases continue to use the public policy rule in *Bremen*. *See Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 914-15 (9th Cir. 2019) (applying the rule and citing cases from other circuits).

A close reading of *Wong* suggests that the Sixth Circuit would not apply the public policy rule in *Bremen* to diversity actions. Not only is the rule conspicuously absent from the list of factors to consider, but the Court of Appeals implicitly limited the reach of *Bremen* to the "context of admiralty cases[.]" *Wong*, 589 F.3d at 826. In *Wong*, the court decided for the first time that federal law governs the enforceability of forum-selection clauses in diversity actions. The other

diversity cases in which the Sixth Circuit cited *Bremen* were decided before *Wong*. Thus, it is doubtful that the public policy rule in *Bremen* applies here.

In an abundance of caution, however, the Court will assume that the public policy rule in *Bremen* is part of the federal law governing the enforceability of forum-selection clauses in diversity cases. Under that assumption, the Court must consider Michigan law to determine whether enforcement of the forum-selection clause would contravene a strong public policy of Michigan. Lakeside contends that the MFIL is a strong or fundamental public policy, and that enforcing the forum-selection clause in the BPA would contravene that policy.

### A. Michigan law does not invalidate the forum-selection clause because Minnesota law governs the BPA

At the outset, the Court notes that the MFIL applies to the BPA only if the parties' relationship was a franchise. At this stage of the case, the Court must accept Lakeside's well-pleaded allegations in the complaint as true. Consequently, the Court accepts as true Lakeside's factual allegations indicating that it is a franchisee eligible for protection under the MFIL.

The MFIL defines a franchise as an agreement whereby all of the following apply:

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor.

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.

(c) The franchisee is required to pay, directly or indirectly, a franchise fee.

Mich. Comp. Laws § 445.1502(3).

As to the first element, Lakeside alleges that Cambria granted it the right to sell Cambria's quartz countertops according to a plan "prescribed in substantial part by Cambria." (First Am.

Compl. ¶ 59.)  A "Business Operating Requirements Manual" set forth the requirements of this plan.  (*Id.* ¶ 18.)  These allegations satisfy the first element of a franchise.

Lakeside further alleges that it sold goods "substantially associated" with Cambria trademarks.  (*Id.* ¶ 59.)  To be substantially associated, "the franchisee must be financially dependent upon the franchisor," as when the franchisee "depend[s] upon the franchisor for the bulk of [its] business."  *Jerome-Duncan, Inc. v. Auto-By-Tel, LLC*, 176 F.3d 904, 911 (6th Cir. 1999).  In this case, more than 80% of Lakeside's sales were of Cambria products, satisfying the second element of a franchise.

As to the third element, Lakeside alleges that Cambria required it to pay an indirect franchise fee by purchasing more than $50,000 in "display advertising," including "cheese boards, Cambria signs, automobile wraps, and various other services."   (First Am. Compl. ¶ 59(c).) Depending on the facts, these purchases may or may not qualify as an indirect franchise fee, but Lakeside's allegations are sufficient to plausibly allege that it was a franchisee protected by the MFIL.  Cambria does not argue otherwise in its motion to dismiss, so the Court has no reason to conclude that Lakeside would not qualify for protection under the MFIL.

Nevertheless, Lakeside's reliance on the MFIL is problematic because the parties agreed that the BPA would be "governed by and construed in accordance with" Minnesota law.  "It is undisputed that Michigan's public policy favors the enforcement of contractual forum-selection clauses and choice-of-law provisions."  *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006).  Minnesota law does not prohibit forum-selection clauses, and the MFIL does not prohibit parties from choosing another state's law to govern their franchise agreements. *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 360 (6th Cir. 1993) ("The [MFIL] does not expressly void choice of law provisions, and we decline to imply such a prohibition.").

Accordingly, if the Court were to accept the parties' choice and apply Minnesota law to the BPA, the forum-selection clause would be valid.

The choice of law in the BPA is not the final word on which law applies, however, because the Court must consider how a Michigan court would evaluate the impact of the parties' choice of law on the forum-selection clause. This analysis aids the Court in determining whether accepting the parties' choice of Minnesota law, and thereby keeping the forum-selection clause intact, would contravene a strong public policy of Michigan.

When a contract designates a state other than Michigan as the forum and as the governing law, a Michigan court "must decide whether to determine the enforceability of the forum-selection clause by applying its own law, or by applying the law designated in the choice-of-law provision." *Turcheck*, 725 N.W.2d at 688. This decision "necessarily requires the court to first determine under its own law whether the contractual choice-of-law provision is itself enforceable." *Id.* at 688 n.2.

To resolve questions about the parties' choice of law, Michigan has adopted the Restatement (Second) of Conflict of Laws. *See Banek*, 6 F.3d at 361. Under section 187 of the Restatement, the parties' choice of law will govern unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.*

Section 187(a) of the Restatement does not apply because Minnesota has a substantial relationship to the parties and their agreement. Cambria is based in Minnesota and Lakeside

ordered quartz countertops from Minnesota. Also, Lakeside sent its employees to Minnesota for training and business meetings.

1.    The MFIL represents the public policy of Michigan

As to section 187(b) of the Restatement, there is no question that, as a general matter, the MFIL represents fundamental public policies of Michigan. Fundamental public policies include those that "make[] one or more kinds of contracts illegal or which [are] designed to protect a person against the oppressive use of superior bargaining power." Restatement (Second) of Conflict of Laws § 187 cmt. g. The MFIL meets this criteria because it "makes one or more kinds of contracts illegal" and it is designed to "protect potential franchisees from the superior bargaining power of franchisors." *Martino v. Cottman Transmission Sys., Inc.*, 554 N.W.2d 17, 21 (Mich. Ct. App. 1996); *see Banek*, 6 F.3d at 362 (noting that Michigan's "comprehensive and paternalistic franchise investment law represents Michigan public policy").

2.    Michigan has a materially greater interest in protecting its franchisees.

Although Minnesota has an interest in protecting the contractual rights of its franchisors, Michigan has a substantially greater interest than Minnesota in protecting the rights of Michigan franchisees. Thus, the relevant question is whether the application of Minnesota law would be contrary to Michigan's fundamental public policy.

3.    Applying Minnesota law would not be contrary to Michigan's fundamental public policy.

"'In order for the chosen state's law to violate the fundamental policy of [the forum state], it must be shown that there are significant differences in the application of the law of the two states.'" *Banek*, 6 F.3d at 362 (quoting *Tele-Save Merch. Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1123 (6th Cir. 1987)); *but cf. Johnson v. Ventra Grp., Inc.,* 191 F.3d 732, 740 (6th Cir. 1999) ("The fact . . . that a different result might be achieved if the law of the chosen forum is applied

15

does not suffice to show that the foreign law is repugnant to a fundamental policy of the forum state.")  Put another way, the Court must consider whether applying Minnesota law would result in "a substantial erosion of the quality of protection that the MFIL would otherwise provide." *Id.*; *see Martino*, 554 N.W.2d at 21 (rejecting choice of Pennsylvania law in franchise agreement because that choice "would result in a substantial loss of protection provided by the MFIL").

As indicated, the MFIL prohibits forum-selection clauses in franchise agreements whereas Minnesota law does not.  The MFIL's prohibition of forum-selection clauses seemingly recognizes that "the burdens of being forced to arbitrate a claim in a foreign forum are significant[.]" *Banek*, 6 F.3d at 360.  Lakeside has not shown that requiring it to bear those burdens is a substantial loss of protection, however.  A Minnesota court is perfectly capable of adjudicating and granting Lakeside relief on whatever claims it has against Cambria.  Moreover, Lakeside has had numerous contacts with Minnesota, so the burden of litigating a case there is not unreasonable.

The lack of a prohibition of forum-selection clauses in the Minnesota Franchise Act (MFA), Minn. Stat. § 80C.01 *et seq.*, is the only significant difference between Minnesota franchise law and the MFIL.  In all other respects, the MFA provides slightly more protection for franchisees than the MFIL.

For instance, the MFA defines franchises more broadly than the MFIL.  Under the MFA, a franchise is an agreement

> (i) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

> (ii) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

> (iii) for which the franchisee pays, directly or indirectly, a franchise fee[.]

Minn. Stat. § 80C.01(a)(1). The first and third elements of a franchise in the MFA (i.e., right to use the franchisor's trademark and payment of a franchise fee) are similar to the second and third elements of a franchise in the MFIL, Mich. Comp. Laws § 445.1502(3). The second element in the MFA, a "community of interest," is met where both parties profit from the marketing of the franchisor's goods. *See Martin Inv'rs, Inc. v. Vander Bie*, 269 N.W.2d 868, 875 (Minn. 1978) (community of interest established where parties shared proceeds from a "common source"). Unlike its counterpart in the MFIL, this element does not contain a "substantiality" requirement. *See id.* at 875 n.8. Moreover, unlike the MFIL, the MFA does not require that the franchisee operate according to a marketing plan prescribed by the franchisor.

The MFA also protects the franchisee from termination without notice and good cause, but its protections are slightly more robust than those in the MFIL. Lakeside contends that Cambria violated Mich. Comp. Laws § 445.1527(c), which prohibits any provision in a franchise agreement that "permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause." *Id.* It defines good cause as including "the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure." *Id.* Similarly, the MFA prohibits any person from terminating or canceling a franchise without giving the franchisee (1) "written notice setting forth all the reasons for the termination . . . at least 90 days in advance" and (2) an opportunity to correct the reasons within 60 days of receipt of the notice. Minn. Stat. § 80C.14(3)(a). The MFA also prohibits termination without "good cause," which is a "failure by the franchisee to substantially comply with the material and reasonable franchise requirements imposed by the franchisor[.]" Minn. Stat. § 80C.14(3)(b). In other words, both statutes prohibit termination of a franchise without good cause and without

giving the franchisee notice and an opportunity to cure, but the MFA requires more advance notice and a longer cure period.

Lakeside also asserts several claims under the MFIL and Michigan common law regarding Cambria's alleged offer or promise to make Lakeside the sole distributor of Cambria countertops in Michigan, but those claims are not affected by the parties' choice of law in the BPA. For instance, Lakeside claims that Cambria made false statements in connection with the offer or sale of a franchise, in violation of Mich. Comp. Laws § 445.1505, and failed to make the disclosures required by Mich. Comp. Laws § 445.1508, in connection with the sale of a franchise. Lakeside also claims that it reasonably relied upon Cambria's alleged promise to make it a sole source supplier, to Lakeside's detriment. In these claims, Lakeside is referring to an offer or promise that is not part of the BPA. According to Lakeside, this offer was for a "new, exclusive franchise, not an extension or renewal of Lakeside's existing franchise." (ECF No. 46, PagID.579-580.) That being the case, the parties' choice of Minnesota law in the BPA does not apply to those claims. The parties' choice of law governs the BPA. It does not govern other transactions between the parties.

Lakeside argues that applying Minnesota law to the BPA would deprive it of a meaningful remedy because "Minnesota courts have uniformly held that the MFA does not apply to out of state franchisees." (Response to Mot. to Dismiss 10, ECF No. 44.) If the MFA does not apply to Lakeside, then Michigan's conflict of law rules would arguably favor application of the MFIL to the BPA. *See Buist v. Digital Message Sys. Corp.*, No. 229256, 2002 WL 31957703, at *4 (Mich. Ct. App. Dec. 27, 2002) (declining to apply the parties' choice of Florida law because Florida franchise law provided "minimal protections" compared to the MFIL, and it was doubtful that Florida law would apply to an out-of-state franchisee); *but cf. Tele-Save*, 814 F.2d at 1123 (noting

18

that "[o]ne may not determine conclusively from [the] omission [of a protective statute in a chosen state] that the application of [that state's] law would be contrary to [the forum state's] policy"). There is little support for Lakeside's argument, however. The text of the MFA suggests that it applies to out-of-state franchisees, and no Minnesota state court has held otherwise.

On two occasions, the Minnesota Supreme Court stated that the Minnesota legislature enacted the MFA in order to protect franchisees located in Minnesota. *See Martin Inv'rs*, 269 N.W.2d at 872 ("Chapter 80C was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry."); *Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (same, citing *Martin Investors*); *see also Banbury v. Omnitrition Int'l, Inc.*, 533 N.W.2d 876, 880 (Minn. Ct. App. 1995) (stating that the Minnesota legislature added the anti-waiver provision to the MFA in order to "protect its citizens"). Some federal courts in Minnesota have reasoned that these statements of intent mean that the MFA does not apply to out-of-state franchisees. *See, e.g., Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1060 (D. Minn. 2014); *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 703 (D. Minn. 2011); *Hockey Enters., Inc. v. Total Hockey Worldwide, LLC*, 762 F. Supp. 2d 1138, 1146 (D. Minn. 2011).

More recent cases have undermined the basis for those federal court decisions. The Minnesota district court of Le Sueur County certified the question of whether out-of-state franchisees can claim protection under the MFA, and the Minnesota Court of Appeals held that this question is "without controlling precedent." *Cambria Co. LLC v. M&M Creative Laminants Inc.*, No. A18-1978, 2019 WL 3543602, at *2 (Minn. Ct. App. Aug. 5, 2019). In other words, the Minnesota Supreme Court's statements about the legislature's intent did not decide the issue. *Id.*

That same district court permitted claims involving Cambria and an alleged Pennsylvania franchisee to proceed under the MFA. *See Cambria Co LLC v. M&M Creative Laminants Inc.*, No. 40-CV-17-662, Order (Minn. Dist. Ct. Jan. 11, 2018), available at ECF No. 53-1. In addition, a federal district court in Minnesota recently re-examined the competing arguments on this issue and decided that the MFA could apply to a relationship between a Minnesota franchisor and an out-of-state franchisee. *See Hamilton v. FranChoice, Inc.*, No. 19-CV-1426 (MJD/ECW), 2019 WL 7598651, at *8 (D. Minn. Dec. 19, 2019), *report and recommendation adopted*, 2020 WL 264148 (D. Minn. Jan. 17, 2020).

The recent decisions by the Minnesota state and federal courts are more consistent with the text of the MFA, which is the best evidence of the legislature's intent. *See Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001). Importantly, only one provision of the MFA—the anti-waiver provision in Minn. Stat. § 80C.21—is expressly limited to franchisees located in Minnesota. In contrast, the MFA's definition of franchise is not limited to franchises operating in the state. Nor are the MFA's requirements for the offer and sale of franchises. The latter requirements apply to offers that "originate" from Minnesota and in which the offeree directs acceptance to Minnesota, "whether or not either party is then present in" Minnesota. *See* Minn. Stat. § 80C.19. The MFA does not require receipt of the offer in Minnesota or by a Minnesota resident; thus, it could apply to offerees residing and operating outside the state. In addition, although there is an exemption to the MFA's registration and disclosure requirements when a franchisor offers or sells a franchise to a non-Minnesota resident operating outside the state, *see* Minn. Stat. § 80C.03(h), that exemption applies only "if the sale is not in violation of any law of the foreign state . . . concerned." *Id.* In other words, to qualify for the exemption, the MFA affirmatively requires Minnesota franchisors to abide by the laws of other states when selling

franchises to residents of those states. Thus, by its own terms, the MFA regulates the sale of franchises to entities outside Minnesota.

The anti-waiver provision mentioned above does not preclude application of other parts of the MFA to non-Minnesota residents. It provides that:

> [a]ny condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise *is a resident of this state*, or, in the case of a partnership or corporation, organized or *incorporated under the laws of this state*, or purporting to bind a person acquiring any franchise *to be operated in this state* to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn. Stat. § 80C.21 (emphases added). Note that the geographic limitations in this provision would be superfluous if the legislature's general intent, or some other rule of construction, sufficed to limit the geographic scope of the statute. Furthermore, had the Minnesota legislature intended the rest of the law to apply only to franchisees operating inside Minnesota, it could have said so in express terms, as it did in the anti-waiver provision, and as other states have done in their franchise statutes. *See, e.g.*, Illinois Franchise Disclosure Act, 815 Ill. Comp. Stat. § 705/19 (1988) (prohibiting termination of franchises "located in" Illinois, except for good cause). The absence of such limiting language in other parts of the MFA, coupled with provisions that leave room for application to out-of-state franchisees, indicate that MFA regulates the conduct of Minnesota franchisors even when they are doing business with franchisees located outside the state.

Other arguments against applying the MFA to out-of-state franchisees are not persuasive. One court relied on the "'general rule' . . . that state statutes apply only to territory of state that enacted the statute." *Johnson Bros.*, 830 F. Supp. 2d at 703 (citing *In re St. Paul & K.C. Grain Co.*, 94 N.W. 218, 225 (Minn. 1903)). However, allowing out-of-state franchisees to assert claims under the MFA is not inconsistent with that rule because the MFA constrains the conduct of

*franchisors* doing business in or from Minnesota. It does not purport to regulate entities operating exclusively outside the state. *See Hamilton*, 2019 WL 7598651, at *9 (concluding that applying the MFA to out-of-state franchisees "is most consistent with the language of the MFA and the general rule that Minnesota statutes are to apply to conduct within its borders").

In short, the Court is not persuaded that Lakeside will be unable to obtain protection under the MFA. Lakeside apparently feels the same way. After the Minnesota state court allowed the MFA claims in *M&M Creative Laminants* to proceed, Lakeside asked this Court for leave to amend its complaint to add claims under the MFA. (*See* Mot. to Amend, ECF No. 52.)

Finally, even if the MFA does not apply to Lakeside, the facts before the Court at this stage make it doubtful that depriving Lakeside of a Michigan forum, or of any other protections in the MFIL, would violate a strong or fundamental public policy of Michigan. In *Tele-Save*, when the Sixth Circuit determined that the parties' choice of law would not violate the fundamental public policy of Ohio, the court found it relevant that the parties had relatively equal bargaining power. *See Tele-Save*, 814 F.2d at 1123 ("We think it important to our decision that the parties to this contract were not of unequal bargaining strength. Their contract was freely negotiated by aggressive and successful business executives, untainted by the suspicion and misgivings characteristic of adhesion contracts."). The Court of Appeals reached a similar conclusion in *Wallace Hardware Co. v. Abrams*, 223 F.3d 382 (6th Cir. 2000), noting that a Kentucky statute designed to protect against "the misuse of superior bargaining power in the context of credit transactions" would not vindicate a fundamental policy of Kentucky in that particular case because the parties entered their agreement in an "arms-length transaction" while represented by counsel. *Id.* at 399-400. And the court made a similar observation in *Banek*, expressing reservation about

voiding the parties' choice of non-Michigan law because the franchisee had negotiated multiple changes to the franchise agreement. *Banek*, 6 F.3d at 361.

As in those cases, there is little indication that the parties here were of unequal bargaining power when they entered into the BPA. At the time, Lakeside was already a successful seller of countertops from Cambria and other manufacturers. Cambria allegedly "honored" Lakeside by making it one of only 14 "Lexus Partners" in North America. (First Am. Compl. ¶ 14.) This "honor" suggests that Cambria recognized Lakeside's success and wanted to keep Lakeside as a business partner. It also suggests that Lakeside did not have to accept the terms of the BPA to continue its business with Cambria. Indeed, even after Lakeside agreed to the BPA, it resisted Cambria's push to sell Cambria products exclusively. Lakeside also attempted to negotiate exclusive control over the market for Cambria products in Michigan. And just a few months after its relationship with Cambria ended, Lakeside alleged in its complaint that it is "one of the largest fabricators of quartz, solid surface, and natural stone countertops in Michigan." (*Id.* ¶ 12.) All of these facts indicate that, when Lakeside agreed to the terms of the BPA, it was an aggressive and successful business; it was not the sort of party with inferior negotiating power that Michigan intended to protect through the MFIL. Thus, even if the MFA does not apply, voiding the choice of law and choice of forum that Lakeside accepted in the BPA would not vindicate Michigan's public policy interests in this case.

For all the foregoing reasons, upholding the parties' choice of Minnesota law in the BPA will not result in a substantial erosion of the protection that Lakeside would otherwise receive under the MFIL. For similar reasons, upholding the forum-selection clause will not "contravene a strong public policy" of Michigan. *See Bremen*, 407 U.S. at 15. Consequently, the parties' choice of forum is enforceable.

### B. Enforcement of the forum-selection clause requires dismissal of the case

After concluding that the forum-selection clause is valid and enforceable, the Court must decide whether and how to enforce it. Because the parties selected a state court as their designated forum, the appropriate way to evaluate that selection is through the "doctrine of *forum non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 52 (2013). If the Court concludes that enforcement is warranted, the Court must dismiss this case because the Court does not have authority to transfer a case to state court. *See id.* at 66 n.8. The federal statute permitting the Court to transfer a case to another venue, 28 U.S.C. § 1404, does not apply when the proper forum is a state court. *Atl. Marine*, 571 U.S. at 60.

Typically, when considering a motion raising the issue of *forum non conveniens*, the Court would evaluate "both the convenience of the parties and various public-interest considerations." *Id.* at 62. "The calculus changes, however, when the parties' contract contains a valid forum selection clause, which represents the parties agreement as to the most proper forum." *Id.* at 63 (internal quotations and citation omitted). In this circumstance, "a district court may consider arguments about public-interest factors only," and "those factors will rarely defeat a [*forum non conveniens*] motion." *Id.* at 64. "When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations." *Id.* at 66.

"As the party acting in violation of the forum-selection clause," Lakeside "must bear the burden of showing that public-interest factors overwhelmingly disfavor" dismissal. *Id.* at 67. Lakeside has not met that burden. It advances no arguments regarding the public interest factors, which include the following:

administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft Co. v. Reno*, 454 U.S. 235, 421 n.6 (1981) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Moreover, Lakeside offers no reason why this case is the "unusual" one in which the forum-selection clause should not control.  *Atl. Marine*, 571 U.S. at 64.  Consequently, the appropriate result is dismissal of the case without prejudice so that Lakeside can bring its claims in the proper forum.

The Court notes that, due to the passage of time since Lakeside filed this action, Lakeside may face difficulty pursuing some of its claims in a new action in the Minnesota state court if the statutes of limitations for those claims have run.  Nevertheless, the Supreme Court made it clear that this sort of concern poses no obstacle to dismissal.  Even where dismissal of an action due to *forum non conveniens* causes the plaintiff to "lose out completely, through running of the statute of limitations," that dismissal "would work no injustice on the plaintiff" because "the plaintiff has violated a contractual obligation by filing suit in a forum other than the one specified in a valid forum-selection clause."  *Id.* at 66 n.8.

In any event, concerns about statutes of limitations in this case are muted by the fact that Lakeside's older claims are its weakest ones, judging from the allegations in the complaint.  The main thrust of this case is that Cambria terminated the parties' relationship unexpectedly, and without just cause, in January 2018.  That was a little over two years ago.  The statutes of limitations in the MFIL and the MFA run for four years and three years, respectively.  *See* Mich. Comp. Laws § 445.1533; Minn. Stat. § 80C.17(5).  Thus, any claims premised on improper termination of a franchise agreement are not in danger of being untimely.

Lakeside's older claims, which arise from vague promises or representations made by Cambria in 2016 or 2017, are tenuous at best. Lakeside allegedly believed that Cambria would make it the only distributor of Cambria countertops in Michigan, but Lakeside's complaint provides little factual support for this expectation. Furthermore, it is not clear how Cambria could have violated requirements for the sale of this potential new franchise under the MFIL or the MFA if the expected sale never materialized.

## <u>Conclusion</u>

In summary, the Court will grant Cambria's motion to dismiss the complaint because this Court is not the proper forum for Lakeside's claims. To be clear, the Court expresses no opinion about whether Lakeside's complaint states a viable claim. Nor does the Court make a final determination about which state's law applies to the BPA or to Lakeside's claims.[3] Instead, the Court finds that Lakeside has not satisfied its burden of demonstrating that the Court should not enforce the forum-selection clause in the BPA. The Court's analysis resolves the issues and arguments presented in this case; the conclusions should be considered accordingly, not necessarily as pronouncements of the law generally.

The Court will also deny Lakeside's motion to amend the complaint because amendment of the complaint would be futile; the proposed amendment would not prevent dismissal of the case.

The Court will enter an order and judgment consistent with this Opinion.


Dated: March 13, 2020                                    /s/ Janet T. Neff
                                                       JANET T. NEFF
                                                       United States District Judge

---

[3] This Court applied Michigan's conflict-of-law rules, but if Lakeside refiles its claims in Minnesota state court, then Minnesota's conflict-of-law rules will apply.